UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS JIMENEZ, | No. C 05-830 MHP (pr) |
| Petitioner, | **ORDER DENYING HABEAS PETITION** |
| v. | |
| ARNOLD SCHWARZENEGGER, | |
| Respondent. | |

## INTRODUCTION

Carlos Jimenez, a prisoner at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Carlos Jimenez was convicted in Los Angeles County Superior Court of second degree murder and was found to have used a firearm in the commission of the offense. He was sentenced to a term of 17 years to life in 1985. His habeas petition does not concern that conviction directly, but instead focuses on a February 27, 2003 decision by a panel of the Board of Prison Terms (now known as the Board of Parole Hearings ("BPH")) finding him not suitable for parole.

The BPH identified several factors in support of its determination that Jimenez was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if he was released. The factors identified included the circumstances of the murder, Jimenez's prior criminal history, his unstable social history, his insufficient

1 participation in self-help programming, and his inadequate parole plans.  The specifics
2 regarding the crime and the circumstances supporting the finding of unsuitability are
3 described in the Discussion section later in this order.

4     Jimenez sought relief in the California courts.  The Los Angeles County Superior
5 Court denied his petition for writ of habeas corpus in 2004 in a reasoned order.  Resp. Exh.
6 F.  The California Court of Appeal denied his petition for writ of habeas corpus in a short
7 but reasoned order.  Resp. Exh. G.  The California Supreme Court summarily denied his
8 petition for review.  Resp. Exh. H.

9     Jimenez then filed his federal petition for writ of habeas corpus.  The court construed
10 Jimenez's federal petition for writ of habeas corpus to allege two cognizable claims:  (1) his
11 right to due process was violated because there was not sufficient evidence to support the
12 BPH's decision and (2) his right to due process was violated because the BPH has an anti-
13 parole bias in considering inmates for parole.  Respondent filed an answer.  Petitioner filed a
14 traverse.  Upon the court's request, supplemental materials were filed regarding a subsequent
15 parole consideration.  The matter is now ready for a decision on the merits.

**JURISDICTION AND VENUE**

17     This court has subject matter jurisdiction over this habeas action for relief under 28
18 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because Jimenez is in
19 custody and the challenged action occurred at the Correctional Training Facility in Soledad.
20 Soledad is in Monterey County, California, within this judicial district.  28 U.S.C. §§ 84,
21 2241(d).

**EXHAUSTION**

23     Prisoners in state custody who wish to challenge collaterally in federal habeas
24 proceedings either the fact or length of their confinement are required first to exhaust state
25 judicial remedies, either on direct appeal or through collateral proceedings, by presenting the
26 highest state court available with a fair opportunity to rule on the merits of each and every
27 claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not
28 dispute that state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

## DISCUSSION

A.  Sufficiency Of Evidence Claim

    1.  Due Process Requires That Some Evidence Support A Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board. Id. at 1128 (quoting

3

1  Superintendent v. Hill, 472 U.S. at 455-56).  The "some evidence standard is minimal, and
2  assures that 'the record is not so devoid of evidence that the findings of the . . . board were
3  without support or otherwise arbitrary.'"  Id. at 1129 (quoting Superintendent v. Hill, 472
4  U.S. at 457).  The some evidence standard of Superintendent v. Hill is clearly established law
5  in the parole context for purposes of § 2254(d).  Sass, 461 F.3d at 1129.
6         A critical issue in parole denial cases concerns the BPH's use of evidence about the
7  murder that led to the conviction.  Three Ninth Circuit cases provide the guideposts for
8  applying the Superintendent v. Hill some evidence standard on this point:  Biggs v. Terhune,
9  334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons v. Carey, 479 F.3d 658 (9th Cir.
10  2007).  Biggs explained that the value of the criminal offense fades over time as a predictor
11  of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful
12  balancing and assessment of the factors considered. . . .  A continued reliance in the future on
13  an unchanging factor, the circumstance of the offense and conduct prior to imprisonment,
14  runs contrary to the rehabilitative goals espoused by the prison system and could result in a
15  due process violation."  Biggs, 334 F.3d at 916-17.  Biggs upheld the initial denial of a parole
16  release date based solely on the nature of the crime and the prisoner's conduct before
17  incarceration, but cautioned that "[o]ver time . . . , should Biggs continue to demonstrate
18  exemplary behavior and evidence of rehabilitation, denying him a parole date simply because
19  of the nature of Biggs' offense and prior conduct would raise serious questions involving his
20  liberty interest in parole."  Id. at 916.  Next came Sass, which criticized the Biggs statements
21  as improper and beyond the scope of the dispute before the court:  "Under AEDPA it is not
22  our function to speculate about how future parole hearings could proceed."  Sass, 461 F.3d at
23  1129.  Sass determined that the parole board is not precluded from relying on unchanging
24  factors such as the circumstances of the commitment offense or the parole applicant's pre-
25  offense behavior in determining parole suitability.  See id. at 1129 (commitment offenses in
26  combination with prior offenses provided some evidence to support denial of parole at
27  subsequent parole consideration hearing).  Recently, Irons determined that due process was
28  not violated by the use of the commitment offense and pre-offense criminality to deny parole

for a prisoner 16 years into his 17-to-life sentence. Irons emphasized that all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." Irons, 479 F.3d at 665; see e.g., id. at 660 (inmate in 16th actual year of his 17-to-life sentence).

The message of these three cases is that the BPH can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs and Irons). Sass did not dispute the principle that, other things being equal, a murder committed 50 years ago is less probative of a prisoner's current dangerousness than one committed 10 years ago. Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to Biggs and Irons. Superintendent v. Hill's standard might be quite low, but it does require that the decision not be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.

Having determined that there is a due process right, and that some evidence is the evidentiary standard for judicial review, the next step is to look to state law because that sets the criteria to which the some evidence standard applies. One must look to state law to answer the question, "'some evidence' of what?"

    2.    State Law Standards For Parole For Murderers In California

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years. A first degree murder conviction yields a base term of 25 years to life and a second degree murder conviction yields a base term of 15 years to life imprisonment. See In re Dannenberg, 34 Cal. 4th 1061, 1078 (Cal.), cert. denied, 126 S. Ct. 92 (2005); Cal. Penal

Code § 190. The upshot of California's parole scheme described below is that a release date normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[1] The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal. Code Regs. § 2402(b).

The regulations contain a matrix of suggested base terms for several categories of crimes. See 15 Cal. Code Regs. § 2403. For example, for second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on some of the facts of the crime. Some prisoners estimate their time to serve

6

1  based only on the matrix. However, going straight to the matrix to calculate the sentence
2  puts the cart before the horse because it ignores critical language in the relevant statute and
3  regulations that requires the prisoner first to be found suitable for parole.
4        The statutory scheme places individual suitability for parole above a prisoner's
5  expectancy in early setting of a fixed date designed to ensure term uniformity. Dannenberg,
6  34 Cal. 4th at 1070-71. Under state law, the matrix is not reached unless and until the
7  prisoner is found suitable for parole. Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he
8  panel shall set a base term for each life prisoner who is found suitable for parole"). The
9  California Supreme Court's determination of state law in Dannenberg is binding in this
10 federal habeas action. See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).
11       The California Supreme Court also has determined that the facts of the crime can
12 alone support a sentence longer than the statutory minimum even if everything else about the
13 prisoner is laudable. "While the Board must point to factors beyond the minimum elements
14 of the crime for which the inmate was committed, it need engage in no further comparative
15 analysis before concluding that the particular facts of the offense make it unsafe, at that time,
16 to fix a date for the prisoner's release." Dannenberg, 34 Cal. 4th at 1071; see also In re
17 Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he
18 nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole"
19 but might violate due process "where no circumstances of the offense reasonably could be
20 considered more aggravated or violent than the minimum necessary to sustain a conviction
21 for that offense").
22       3.    Some Evidence Supports The BPH's Decision In Jimenez's Case
23       The BPH identified several factors supporting its decision to find Jimenez unsuitable
24 for parole, i.e., the circumstances of the murder, his criminal history, his unstable social
25 history, his insufficient participation in beneficial self-help programming and his inadequate
26 parole plans. The California Court of Appeal upheld the decision in a reasoned order,
27 stating that some evidence had to support the decision and found that some evidence did
28 support the decision: "While some factors weigh in petitioner's favor in determining

7

suitability for parole, the failure to complete substance abuse programs and his inability to show a realistic plan for release meet the 'some evidence' standard for court review of the decision of the Board of Prison Terms."  Resp. Edh. G.  Because the California Court of Appeal's decision is the last reasoned decision, that is the decision to which § 2254(d) applies.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005), cert. denied, 126 S. Ct. 2041 (2006).

          a.      <u>Commitment Offense</u>

The facts of the crime were described in the California Court of Appeal decision on the criminal appeal and the probation officer's report, which a BPH commissioner read into the record:

> At about 1:00 a.m. on January 28th, 1983, Ricardo and Virginia Sanchez were awakened by a loud banging on the door of their bedroom where they and their three children lay sleeping.  The door was broken and Mr. and Mrs. Sanchez saw two men standing in the hallway.  One of the men, later identified as [Jimenez], held a gun.  He asked for Jose and Mr. Sanchez replied that no one named Jose lived there.  The armed man asked for Jose again and again was told that there was no Jose living there.  The two men then left the residence and Mr. Sanchez went to the kitchen and obtained a knife.  There was a knock at the front door, and Mr. Sanchez threw the knife behind a piece of furniture in the living room.  As he opened the front door, he was shot in the abdomen.  Mrs. Sanchez ran to the door and saw the man, whom she later identified as the man with the gun, [Jimenez], running away.  Mr. Sanchez died 10 minutes later as a result of the gunshot wound.  Ballistics tests confirmed that the bullet removed from Mr. Sanchez's body was fired by a handgun belonging to Mrs. Martha Mankiller, the grandmother of Donald Maestas . . . the person who had accompanied [Jimenez] during the crime.  Maestas resided with his grandmother and mother, Lanita . . . Maestas in a home directly behind the Sanchez residence.  [Jimenez] visited his friend Maestas and his mother there often. . . .
>
> [Jimenez] explains that he had been in an argument with some guys who were drunk.  One of the guys took a swing at him and hit Mrs. Maestas in the mouth, cutting her lip.  Then over the next month, they continued to see these guys and they were telling . . . defendant to get off their block.  He went to the victim's residence to tell him to stay off his back.  He just wanted to scare him, did not intend to shoot anyone.  When the victim opened the front door, he lunged at [Jimenez] with a knife so he shot him.

RT 6-8; <u>see also</u> Resp. Exh. B.  Jimenez later told his correctional counselor that his crime was not gang-related.  RT 9.  Jimenez denied that he went back to the house because Maestas had urged him to go back and finish the business.  RT 30-31.

A circumstance tending to indicate unsuitability for parole is that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner."  15 Cal. Code

8

1  Regs. § 2402(c)(1). The factors to be considered in determining whether that circumstance
2  exists are that there were multiple victims, "[t]he offense was carried out in a dispassionate
3  and calculated manner, such as an execution-style murder," "[t]he victim was abused, defiled
4  or mutilated during or after the offense," "[t]he offense was carried out in a manner which
5  demonstrates an exceptionally callous disregard for human suffering," and "[t]he motive for
6  the crime is inexplicable or very trivial in relation to the offense." 15 Cal. Code Regs. §
7  2402(c)(1). The BPH considered a circumstance proper under California law.

8        The BPH considered the circumstances of the murder and concluded that the
9  circumstances of it showed that Jimenez was unsuitable for parole and would pose an
10 unreasonable risk of danger if released. RT 36. The BPH stated that the motive for the
11 crime was inexplicable and it was "carried out in a fashion that demonstrates a lack of regard
12 for the life [of Sanchez] and suffering of" Sanchez's wife and three children who were in the
13 room when Sanchez was shot. RT 37.

14       There was sufficient evidence to support the finding that the circumstances of the
15 commitment offense tended to show unsuitability. There was evidence that the victim was
16 shot while in the presence of his wife and children, after he had been woken up by Jimenez
17 and Maestas moments earlier. The evidence also supported the determination that the motive
18 was inexplicable: Sanchez was not the person Jimenez was in search of and was shot for no
19 apparent reason. Jimenez's characterization of the event as a "de minimus second degree
20 murder," Traverse, p. 14, grossly and offensively underestimates the severity of the crime,
21 however. While the murder in this case did not appear to be significantly worse than other
22 second degree murders, and therefore may not alone support the denial of parole, it was not
23 the sole basis for the parole denial; the BPH relied on several other factors to determine that
24 Jimenez was not suitable for parole.

25       b.    <u>Pre-Incarceration History</u>

26     The BPH is to consider all relevant and reliable information in determining suitability
27 for parole. The information to be considered includes the prisoner's "past criminal history,
28 including involvement in other criminal misconduct which is reliably documented." 15 Cal.

9

Code Regs. § 2402(b). The BPH also may consider an unstable social history as tending to show unsuitability for parole. 15 Cal. Code Regs. § 2402(c)(3). On the other side of the equation, circumstances tending to indicate suitability include the absence of a juvenile record "of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims," a stable social history, and the absence of a significant history of violent crime. 15 Cal. Code Regs. § 2402(d).

The BPH considered circumstances proper under California law in finding that Jimenez's criminal history tended to show he was unsuitable for parole. Although he was only 18 years old when he murdered Sanchez, Jimenez had already had numerous entries in his criminal record. Starting when he was age 14, Jimenez had ten arrests as a juvenile for abusing driving privileges, alcohol use and possession, crimes against property (including grand theft, burglary and vandalism), possession of an illegal weapon, being drunk and/or on drugs, prowling at night and violating probation. He had been placed in a juvenile camp twice and murdered Sanchez after he had just completed a six-month stay in custody for not complying with terms of probation. Sanchez was in custody at a juvenile facility when he was arrested for the murder of Sanchez. See Resp. Exh. B; RT 10-11. His adult criminal history consisted of an arrest for grand theft auto (which was not prosecuted), being a minor in possession of alcohol (with no disposition shown) and auto theft (with no disposition shown). RT 11. He also had four outstanding traffic warrants even though he never held a valid driver's license. RT 11. He had been in juvenile correctional camps twice and had been on probation – showing that he did not profit from prior attempts to correct his criminality. See RT 11, 37. There was sufficient evidence to support the BPH's reliance on Jimenez's prior criminality as tending to show that he was not suitable for parole.

Closely related to Jimenez's criminal activity was his unstable social history, most notably a significant substance abuse problem. In the years before the murder, he had used alcohol, sniffed paint and glue, and used marijuana, LSD and PCP. RT 10-12. Jimenez stated in 1985 that he had been drinking about three cases of beer a week for the last three or four years, that he sniffed glue and paint every 3-4 days for a year when he was 13, and had

1  tried marijuana and PCP but did not like them.  Resp. Exh. B, p. 10.  Jimenez had dropped
2  out of school between the 7th and 9th grade.  RT 12.  (He obtained a GED once he was in
3  prison in 1998, however, and had even taken some college courses.  RT 20.)  Jimenez also
4  had been in a street gang before his imprisonment since about age 12 or 13.  See RT 26, 29.
5  Jimenez's history of substance abuse, dropping out of high school and gang membership
6  provided some support for the BPH's reliance on his unstable social history as tending to
7  show unsuitability for parole.
8       The prior criminality and unstable social history might not alone support the denial of
9  parole, but they could be considered as part of the bigger picture when deciding whether
10 Jimenez was suitable for parole.  "Circumstances which taken alone may not firmly establish
11 unsuitability for parole may contribute to a pattern which results in a finding of
12 unsuitability."  15 Cal. Code Regs. § 2402(b).
13             c.    In-Prison Behavior
14      The BPH is allowed to consider a great range of relevant and reliable information,
15 such as the prisoner's social history and mental state.  15 Cal. Code Regs. 2402(b).  The BPH
16 may consider as a circumstance tending to indicate suitability for parole the prisoner's
17 institutional activities that "indicate an enhanced ability to function within the law upon
18 release."  15 Cal. Code § 2402(d)(9).
19      The BPH found that Jimenez had insufficiently participated in beneficial self-help
20 programming.  RT 38.  The BPH identified specifically Jimenez's insufficient participation in
21 substance abuse prevention programs.  RT 38.
22      As noted in the preceding section, Jimenez had a serious substance abuse problem
23 before he was incarcerated.  It did not end with incarceration: in 1993 -- eight years into his
24 sentence -- he had received a CDC-115 rule violation report for being under the influence of
25 a controlled substance.  RT 22; Resp. Exh. D (disciplinary sheet).  Jimenez had participated
26 in 1992 in an Alcoholics Anonymous program but did not agree with the program.  He had
27 just started back into the AA program about a month before his parole hearing in 2003.  RT
28 16-18.  His brief foray into AA in 1992 followed by a disciplinary write-up the following

11

year for being under the influence indicated that he didn't have his substance abuse problem under any sort of control then. And he was only one month into AA – and that had been a meeting every other Saturday morning – at the time of his 2003 hearing. See RT 16. The psychological report for Jimenez included a psychiatric diagnosis of substance abuse in institutional remission and antisocial personality disorder by history, and noted that a return to substance abuse and the gang culture presented risk factors which may be precursors to violence if Jimenez was paroled. See RT 26. Jimenez stated he had been free from gangs and substance abuse for ten years as of the 2003 hearing. RT 28. He had not, however, followed the recommendation at the last parole consideration hearing in 1997 to participate in self-help, AA and/or NA, and take advantage of any therapy offered. See RT 19. The BPH's determination that Jimenez's failure to sufficiently participate in beneficial self-help programming and need for further participation was a proper circumstance to consider and was well-supported in the record.

The BPH's consideration of and reliance on Jimenez's inadequate participation in beneficial self-help programming and need for further programming was not improper. Section 2402(b) specifically allows the BPH to consider a great range of relevant and reliable information, such as the prisoner's social history and mental state.

In his traverse, Jimenez appears to protest that the state cannot force him to do a religious-based program such as AA or NA. Traverse, p. 3. He did not assert any religious objection to AA or NA at his parole hearing in 2003; to the contrary, he said he was participating in AA and did not object to the 12-step program. There are alternatives to the AA and NA programs at prison to address substance abuse problems. The BPH will not be faulted for failing to inform Jimenez of them when he has not mentioned to the panel any religious objection to the programs. If Jimenez does not want to participate in AA or NA on First Amendment grounds, he has the opportunity to explore other avenues of addressing his substance abuse problem.

1            d.      Inadequate Parole Plans

The prisoner's parole plans can be considered by the BPH. Among the circumstances listed as tending to show suitability are the existence of realistic plans for the release or the development of marketable skills that can be put to use upon release. See 15 Cal. Code Regs. § 2402(d)(8). Section 2402(b) allows the BPH to consider "any other information which bears on the prisoner's suitability for release."

The BPH noted that Jimenez "has no parole plans essentially. He says he'll live with his mother in one report and with his cousin in another, and there are no letters to support either of those choices. He also has no work or job offers." RT 38-39. The BPH did note that he had marketable skills, however, referring to his vocational training in machine shop, air conditioning and refrigeration, and his ongoing training in drafting. RT 38-39. Jimenez admitted he had no current written offer for a residence or job. RT 13-15. Jimenez's attorney stated that Jimenez had not worked on parole plans because he realized he was not going to receive a parole date. RT 33-34.

There was some evidence to support the BPH's reliance on the absence of adequate parole plans. This is another factor that alone could not support the denial of parole but could be considered as one part of the overall picture that showed Jimenez was not suitable for parole. See 15 Cal. Code Regs. § 2402(b).

            e.      There Was Enough Evidence To Support The Decision

There was some evidence to support the determination that Jimenez's commitment offense, pre-incarceration criminality and unstable social history, inadequate self-help programming regarding substance abuse, and inadequate parole plans made him unsuitable for parole at the 2003 hearing. These circumstances could be considered alone as well as cumulatively in determining parole suitability. "Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." 15 Cal. Code Regs. § 2402(b).

The weight to be attributed to the commitment offense and pre-conviction criminality may fade over time as a predictor of current dangerousness, but the rate at which those facts

1  fade as predictors slows down when the prisoner does not demonstrate rehabilitation.  Here,
2  Jimenez's pre-incarceration criminality had substantial links to substance abuse and he had
3  received a disciplinary write-up for substance abuse (albeit a decade before the 2003
4  hearing), yet he had failed to follow the previous panel's recommendation that he participate
5  in some self-help programming.  Jimenez's inexplicable shooting of a man he woke from his
6  sleep, plus his criminal history, plus his unstable social history plus his insufficient
7  programming in substance abuse prevention, plus his inadequate parole plans provided some
8  evidence to support the BPH's view that he is not suitable for parole and would present a
9  danger to society if released on parole even though he had already been in prison 18 actual
10  years since his 17-to-life sentence was imposed.

11  The California Court of Appeal's decision focused on his failure to complete
12  substance abuse programs and his inability to show a realistic plan for release met the "some
13  evidence" standard.  Resp. Exh. G.  That court's rejection of his insufficient evidence claim
14  was not contrary to or an unreasonable application of the <u>Superintendent v. Hill</u> some
15  evidence standard.  He is not entitled to the writ on this claim.

16  B.      <u>Biased Decision-Maker Claim</u>

17  Jimenez next claims that the BPH has violated his right to due process by adopting an
18  "anti-parole policy."  Petition, p. 5.  He contended that parole has been granted on "only
19  approximately 200 dates out of over 11,000 hearings."  <u>Id.</u> at 5.  The court understood this to
20  be a biased decision-maker claim.

21  A "'fair trial in a fair tribunal is a basic requirement of due process.' . . .  This applies
22  to administrative agencies which adjudicate as well as to courts."  <u>Withrow v. Larkin</u>, 421
23  U.S. 35, 46 (1975) (citations omitted) (combination of investigative and adjudicative
24  functions does not necessarily show a biased decision-maker); <u>see also</u> <u>Morrissey v. Brewer</u>,
25  408 U.S. 480, 489 (1972) (due process requires neutral and detached decision-maker for
26  parole revocation hearing).

27  Jimenez's claim fails.  Jimenez offers no evidence in support of his assertions.  He has
28  not shown actual bias by any of the individual commissioners on the BPH panel.  Indeed, he

14

and his attorney declined to object to the panel at the hearing. See RT 3-4. And his unsupported assertion that parole was granted 200 out of 11,000 times actually contradicts the assertion that there is a flat no-parole policy. Parole may not be the norm, but that does not mean that no one is ever found suitable.

Jimenez cites to a district court decision in the Eastern District of California regarding the alleged no-parole policy of Governors Wilson and Davis. Even if one accepts as true that those governors had a no-parole policy, Jimenez has received another parole consideration hearing before a panel that was not composed of members appointed by either Governor Wilson or Governor Davis. Jimenez had a subsequent parole consideration hearing on July 28, 2005, at which he was again found not suitable for parole. The panel consisted of commissioner Margarita Perez and deputy commissioner Diane Lushbough. Perez was appointed by Governor Schwarzenegger and Lushbough was "not a Governor-appointee." Supplemental Material, Remy Decl., p. 1. (Docket # 12.) Thus, even if Jimenez could prove his allegation that his 2003 hearing was conducted under a no-parole policy in violation of his right to due process, he has already received the remedy to which he would be entitled: a new hearing before an unbiased board. Cf. O'Bremski v. Maas, 915 F.2d 418, 422-23 (9th Cir. 1990) (denying relief if a new panel at a new hearing would reach the same outcome). California's governorship is not a static institution that continues on one course regardless of the inhabitant of the office. The alleged bias against parole held by Governors Wilson and Davis cannot be attributed to Governor Schwarzenegger unless the latter does something to adopt that alleged policy. Jimenez offers no evidence that Schwarzenegger has adopted his predecessors' policies with regard to parole. Each Governor is entitled to separate consideration vis-a-vis his parole policy. The writ will not issue on the biased decision-maker claim.

**CONCLUSION**

For the foregoing reasons, the petition is denied on the merits. The clerk shall close the file.

IT IS SO ORDERED.

DATED: April 25, 2007

Marilyn Hall Patel
United States District Judge

**NOTE**

1.      The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).